Michael P. Thornton, BBO# 497390
David J. McMorris, BBO#  338970
Leah M. Carlsen, BBO# 681437
THORNTON LAW FIRM LLP
100 Summer Street, 30th Floor
Boston, MA 02110
Telephone: (617) 720-1333
Facsimile:  (617) 720-2445
mthornton@tenlaw.com
dmcmorris@tenlaw.com
lcarlsen@tenlaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HILARY SARGENT, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC.,<br><br>      Defendant. | **No.:**<br><br>**COMPLAINT**<br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................. 1

II. PARTIES ........................................................................................... 3

    A.  Massachusetts Plaintiff .............................................................. 3

    B.  Defendant ................................................................................ 4

III. JURISDICTION AND VENUE ......................................................... 5

IV. FACTS .............................................................................................. 6

    A.  Volkswagen Markets the Affected Vehicles as High-Performance, Eco-Friendly, and Fuel-Efficient Diesel Vehicles .................................................................................. 6

    B.  Diesel Emissions Regulatory Framework ............................... 12

    C.  Volkswagen Lied to Its Consumers and Deliberately Concealed the Excessive and Unlawful Levels of Pollution Emitted by Many of Its So-Called "Clean Diesel" Vehicles ................. 17

    D.  Volkswagen Admitted Its Fraud ........................................... 21

    E.  Volkswagen Has Reaped Considerable Profit From Its Fraud .............. 21

    F.  Plaintiffs and Class Members Have Suffered Significant Harm as a Result of Volkswagen's Fraud ............................... 22

V. FRAUDULENT CONCEALMENT ALLEGATIONS ..................... 24

VI. TOLLING OF THE STATUTE OF LIMITATIONS ....................... 26

    A.  Discovery Rule Tolling ........................................................ 26

    B.  Tolling Due To Fraudulent Concealment .............................. 27

    C.  Estoppel ................................................................................ 28

VII. CLASS ACTION ALLEGATIONS ................................................ 28

    1.  Numerosity: Federal Rule of Civil Procedure 23(a)(1). ...... 29

    2.  Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). ........................................ 29

    3.  Typicality: Federal Rule of Civil Procedure 23(a)(3) ......... 31

    4.  Adequacy: Federal Rule of Civil Procedure 23(a)(4). ........ 31

    5.  Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2). .......................................................... 31

6.  Superiority: Federal Rule of Civil Procedure 23(b)(3)........................32

VIII. CAUSES OF ACTION........................................................................................32

A.  Claims Asserted on Behalf of the Nationwide Class..............................32

COUNT  I Unjust Enrichment .....................................................................32

B.  Claims Brought on Behalf of the Massachusetts Subclass ....................33

COUNT  IX Fraudulent Concealment (Common Law) ..........................33

COUNT  X Violations of the Massachusetts Consumer
Protection Act (Mass. Gen. Laws Ch. 93A) ..............................................35

IX. REQUEST FOR RELIEF....................................................................................36

X. DEMAND FOR JURY TRIAL ..........................................................................36

Plaintiff Hilary Sargent ("Plaintiff"), individually and on behalf of all others similarly situated, allege the following against Volkswagen Group of America, Inc. ("Defendant" or "Volkswagen"), based where applicable on personal knowledge, information and belief, and the investigation of counsel. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

## I. INTRODUCTION

1.      For over six years, Volkswagen has intentionally and systematically deceived its customers, lied to the government, and misled the public about the efficacy of its four cylinder diesel-engine vehicles sold under the Volkswagen and Audi brands.  Volkswagen has marketed its so-called "clean diesel" vehicles as high performing, fuel efficient, and environmentally-friendly.  In truth, Volkswagen's clean diesel vehicles are anything but clean.

2.      Instead, the Affected Vehicles, defined below, emit noxious pollutants at up to 40 times the legal limit allowed under federal and state law. In order to conceal this inconvenient truth from regulators and the public, Volkswagen installed a sophisticated software algorithm, or "defeat device," in the Affected Vehicles that instructs them to cheat on emissions tests; that is, to engage full emissions controls only when undergoing official emissions testing.  At all other times, the emissions controls are de-activated, and the vehicles emit extremely high, and illegal, levels of pollutants.  "Truth in Engineering," is Audi's official slogan.  Ironically, these Audis (and Volkswagens) were engineered to deceive.

3.      Indeed, in an industry increasingly dominated by software development, Volkswagen secretly installed software in its diesel vehicles that capped emissions only during EPA-mandated testing.  When the testing was completed, the vehicle automatically removed the emissions cap, thereby increasing the engine performance.  So, while on the surface the vehicles complied

with federal emissions standards testing, in fact those same vehicles emitted up to 40 times the legal limit of nitrogen oxide into the air.

4.    As used in this Complaint, the "Affected Vehicles" refer to Volkswagen and Audi vehicles sold in the United States with 4-cylinder, Type EA 189 diesel engines, which share a common, uniform, deceitful, and harmful design, in that they (A) emit high and illegal levels of pollutants in normal operation— up to 40 times the legal limit of nitrogen oxide air; (B) are equipped with a defeat device enabling them to bypass emissions regulations; and (C) cannot deliver the advertised combination of low emissions, fuel economy, and high performance for which they were marketed and advertised.  (The "Defect".)  The Affected Vehicles include at least the following makes and model years with the 2.0L TDI Diesel engine (Type EA 189):

    (a)    2009 – 2015 Volkswagen Jetta

    (b)    2009 – 2014 Volkswagen Jetta SportWagen

    (c)    2012 – 2015 Volkswagen Beetle

    (d)    2012 – 2015 Volkswagen Beetle Convertible

    (e)    2010 – 2015 Volkswagen Golf

    (f)    2015 Volkswagen Golf SportWagen

    (g)    2012 – 2015 Volkswagen Passat

    (h)    2010 – 2015 Audi A3

5.    Instead of delivering on its promise of extremely high fuel mileage coupled with low emissions, Defendant devised a way to make it *appear* that its cars performed as advertised when, in fact, they did not. Put simply, Defendant lied.

6.    Volkswagen has admitted that the defeat device was present in approximately 482,000 Affected Vehicles sold in the United States, and more than 11 million vehicles worldwide. But Volkswagen has only *just now* admitted its culpability after an ongoing government investigation into its serious

misrepresentations. Indeed, Volkswagen's CEO accepted "responsibility for the irregularities that have been found in diesel engines." Even that statement falls far short of acknowledging the wide scale illegal actions taken to deceive consumers and federal regulators.

7. The defeat devices, which were designed and installed by Defendant, work by switching on the full emissions control systems in the Affected Vehicles *only* when the car is undergoing periodic emissions testing. The technology needed to control emissions from Defendant's cars to meet state and federal emissions regulations reduces their performance, limiting acceleration, torque, and fuel efficiency.

8. To hide this, the defeat device simply shuts off most of the emissions control systems in the car once the car has completed its emissions test. While that may have made the car more fun to drive, it resulted in Defendant's cars sending up to 40 times as much pollution into the environment as is allowed under the Clean Air Act and state regulations.

9. Those violations are explained in the EPA's Notice of Violation issued to Defendant, as well as a letter from the California Air Resources Board ("CARB"), copies of which are attached to this Class Action Complaint as **Exhibits A and B**, respectively.

## II. PARTIES

### A.    Plaintiff

#### a)    Plaintiff Hilary Sargent

10. Plaintiff Hilary Sargent is, and at all times relevant to this Complaint was, a resident and citizen of Massachusetts. Plaintiff purchased a 2013 Volkswagen Jetta Sportwagen TDI from Boston Volkswagen in July of 2013, an authorized Volkswagen dealer in Watertown, Massachusetts, without knowledge of the "defeat device," a Defect which caused the vehicle to obtain a fraudulent

EPA certification and pass emissions tests, but at all other times emit up to 40 times the allowed level of pollutants, including NOx.

11.    Plaintiff purchased the Jetta SportWagen TDI for personal, family, and household use.  Prior to purchasing the vehicle, Plaintiff read and relied on marketing brochures and sales materials in deciding to make the purchase, including information about the TDI "Clean Diesel" technology.  For example, the sales brochure states, "At a filling station way, way back there, you filled up your Jetta SportWagen TDI with clean diesel. . . . And as your vehicle sipped fuel at the wallet-friendly rate of 42 highway mpg, you were busy seeing the sights, or running errands, or picking up the kids, or doing whatever else you wanted to do with your freedom."  A true and accurate representation of the Jetta SportWagen TDI's sales brochure is attached as **Exhibit C**.

12.    Plaintiff has been concerned about the "defeat device" ever since learning of its revelation in the public media.

13.    Plaintiff would not have purchased the vehicle had she known of the "defeat device" prior to her purchase.

14.    Plaintiff is further worried the car's resale value will drop and any repairs done to her vehicle as part of a recall could diminish its performance, also affecting the resale value

**B.    Defendant**

15.    Defendant Volkswagen Group of America, Inc. ("Volkswagen") is a corporation doing business in every U.S. state and the District of Columbia, and is organized under the laws of New Jersey, with its principal place of business at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171. Volkswagen is therefore a citizen of New Jersey and Virginia. *See* 28 U.S.C. § 1332(d)(10).

16.    Volkswagen's address for customer complaints is 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171.  VW's registered agent for service of process is Volkswagen Group of America, Inc., c/o Corporation Service Company

which will do business in California as CSC - Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste. 150n, Sacramento, CA 95833.

17.    Volkswagen maintains a design research center in California: Volkswagen Audi Design Center ("VADC"), 2772 Donald Douglas Loop North, Santa Monica, CA 90405.

18.    Though Audi–brand vehicles are sold under a different brand name in the United States, and are generally sold as more luxurious vehicles, Audi vehicles are universally manufactured, marketed, and distributed by Volkswagen. Moreover, Audi has the same registered agent for service of process in the United States as VW and utilizes the same VADC California design studio.

19.    At all relevant times, Volkswagen manufactured, distributed, sold, leased, and warranted the Affected Vehicles under the Volkswagen and Audi brand names throughout the nation. Volkswagen and/or its agents designed the Clean Diesel engines and engine control systems in the Affected Vehicles, including the "defeat device." Volkswagen also developed and disseminated the owners' manuals and warranty booklets, advertisements, and other promotional materials relating to the Affected Vehicles.

20.    Defendant Volkswagen, including its Audi-branded vehicles, is herein referred to simply as "Volkswagen".

### III.  JURISDICTION AND VENUE

21.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

22.    This Court has personal jurisdiction over Defendant because it conducts business in Massachusetts, and has sufficient minimum contacts with

Massachusetts. For example, Volkswagen operates numerous Volkswagen dealerships in Massachusetts.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and because Defendant has caused harm to Class members residing in this District.

## IV.  FACTS

24.     Defendant intentionally designed and sold cars that misled consumers and regulators about the amount of pollution those cars created and the fuel efficiency they produced. Despite touting themselves as an environmentally conscientious company that produced thoughtful cars for people who cared about the environment, Defendant sold expensive cars that produced pollution at orders of magnitude above federal and state regulations, and then intentionally and knowingly hid the truth about those cars.

## A.    Volkswagen Markets the Affected Vehicles as High-Performance, Eco-Friendly, and Fuel-Efficient Diesel Vehicles

25.     Volkswagen designs, manufactures, markets, distributes, and warrants vehicles in the United States under the Volkswagen and Audi brand names. Volkswagen recently surpassed Toyota, becoming the world's largest automaker, with diesel engine vehicles accounting for over 20 percent of its sales.

26.     Diesel vehicles are generally more fuel efficient and powerful than gasoline engines. Diesel engines, however, emit higher levels of certain pollutants as a by-product of combustion.

27.     Diesel engines first became common in American passenger vehicles in the 1970s and 1980s, but gained a reputation as "dirty" because they emitted noxious gases and particulate matter. As diesel engines need to be more robust than comparable gasoline engines, diesel-powered vehicles also cost more to

produce and commanded a premium price. These factors, combined with increasingly stringent emissions regulations caused diesel passenger vehicles to become unpopular in the American market.

28.     In the mid-2000s, Massachusetts and several other states passed new emission standards strictly regulating exhaust emissions, including oxides of nitrogen (NOx). This effectively banned the sale of diesel passenger vehicles in these states because the nature of diesel engines inherently makes NOx emissions a particularly difficult problem to resolve. Facing the implementation of similarly stringent federal regulations, Volkswagen and several other manufacturers launched the joint BlueTec Diesel initiative to research and develop "exhaust emission treatment systems which meet even the strictest emission regulations in the US market."

29.     By the late 2000s, Volkswagen claimed to have improved diesel technology and developed an environmentally-friendly diesel engine that could meet modern emissions standards. Volkswagen marketed these new vehicles as "Clean Diesel," arguing that its engines were much improved from the diesels of the 1970s and 1980s. Taking advantage of then-rising fuel prices, and diesel engines' fuel-efficiency and high torque outputs, Volkswagen told consumers they could have it all—power, high fuel economy, and low emissions—if they paid a few thousand dollars more for its "clean" diesel vehicle.

30.     Volkswagen attempted to address this problem with its so-called "clean diesel" vehicles. In an effort to make the Affected Vehicles more marketable and induce consumers to pay premium prices, Volkswagen claimed its clean diesel TDI (turbocharged direct injection) engines combined fuel efficiency and high performance with low emissions. The combination of these three characteristics was the primary selling point for the Affected Vehicles and was the centerpiece of Volkswagen's advertising efforts.

31.    Volkswagen's outward concern for the environment is put forth beyond just the model names and purported attributes of their vehicles. For example, on the "Environment" page of its website, Volkswagen Group of America states that it takes "environmental responsibility very seriously. When it comes to making our cars as green as possible, Volkswagen has an integrated strategy focused on reducing fuel consumption and emissions, building the world's cleanest diesel engines and developing totally new power systems, which utilize new fuel alternatives."

32.    Volkswagen also embarked on a major marketing campaign emphasizing its vehicles' low emissions and environmental friendliness. Volkswagen created various webpages, press releases, and television commercials dedicated to differentiating "Clean Diesel" from consumer perceptions of dirty diesel vehicles. In August 2008, Volkswagen kicked off the campaign by announcing that it had developed the first diesel vehicle compliant in all fifty states under modern emission standards, its 2.0L TDI (Turbocharged Direct Injection) engine. Then CEO Stefan Jacoby stated, "We're proud to be the first manufacturer to offer a clean diesel vehicle for sale in all fifty states," and argued that the clean diesel Jetta model "truly offer[s] a no compromise alternative fuel driving experience, that provides the customer the best of both worlds—excellent fuel efficiency combined with a dynamic driving experience." Below is an image of the headline from Volkswagen's announcement:



33.     Following this announcement, the diesel Audi A3 TDI and Volkswagen Jetta TDI were named the 2010 Green Car of the Year and the 2009 Green Car of the Year, respectively by Green Car Journal. Volkswagen began to promote the Jetta TDI as the "Official Pace Car of the Environment" and again described its clean diesel vehicles as the "best of both worlds, an alternative fuel vehicle with no compromises." Volkswagen's website specifically emphasized emissions compliance, describing how "[f]uel efficiency, performance and convenience come standard with the 50-state compliant Jetta TDI sedan and Sportswagen models, which meet the most stringent emission standards in California." Another Volkswagen promotion suggested that clean diesel vehicles were a "new alternative for shoppers craving efficiency, low emissions, and unrivaled value all in one attractive package." Most of all, Volkswagen tried to distance itself from consumer perceptions of dirty diesel emissions, describing how "[t]hose old realities no longer apply." Below are images from Volkswagen's webpage promoting the environmental friendliness of its clean diesel vehicles:





34.     Some advertisements, for example, specifically emphasized the low emissions and eco-friendliness of the vehicles:

## With reduced emissions.

These are not the kind of diesel engines that you find spewing sooty exhaust like an old 18-wheeler. Clean diesel vehicles meet some of the strictest standards in the world. Plus, TDI technology helps reduce sooty emissions by up to 90%, giving you a fuel-efficient and eco-conscious vehicle.[1]

▶ Watch and learn about TDI® Clean Diesel









35.     Other advertisements touted the combination of fuel efficiency and power:





36.     Additional advertisements addressed the full package, implying that in contrast to the "stinky, smoky, and sluggish" diesel vehicles of old, Volkswagen's new diesel vehicles were clean, efficient, and powerful all at once:





37.     Volkswagen's efforts were a resounding success, as Volkswagens and Audi TDIs became the highest-selling diesel passenger cars in the United States. Unfortunately, the "clean diesel" vehicles were a sham.

## B.     Diesel Emissions Regulatory Framework

38.     Because of the serious hazards created by nitrogen oxide emissions, both the EPA and the MassDEP have regulated NOx.

39.     The federal Clean Air Act prohibits the sale of any vehicle in the United States that does not comply with emissions regulations set by the EPA. 42 U.S.C. §7522. The current regulations, Tier 2, were implemented by the EPA between 2004 and 2009, and apply to all light-duty vehicles regardless of the fuel that they use. The Tier 2 regulations include certification levels of different levels of stringency, called certification bins. Volkswagen chose to certify Affected Vehicles to the Tier 2, Bin 5 standard, which has a maximum NOx level of .05

g/mi for a vehicle's intermediate life (5 years/50,000 miles) and .07 g/mi for a vehicle's full useful life (10 years/120,000 miles). 40 C.F.R. § 86.1811-04(c). In addition, a manufacturer's fleet average of NOx for any given model year must be under .07 g/mi. *Id*. at § 86.1811-04(d).

40.     On the state level, MassDEP adopted Low-Emissions Vehicle (LEV) II emission standards that generally became applicable in the 2004 model year. *See* The Massachusetts Air Pollution Control Regulations, http://www.mass.gov/eea/agencies/massdep/air/regulations/310-cmr-7-00-air-pollution-control-regulation.html (amended January 1, 2015); 310 CMR 7.40, adopting Cal. Code. Regs. Tit. 13. Under the LEV II standard, NOx emissions were significantly tightened and required light-duty passenger vehicles (including Affected Vehicles) to emit no more than .05 g/mi initially, and no more than .07 g/mi over their useful life. 310 CMR 7.40, Cal. Code. Regs. Tit. 13 § 1961.

41.     To comply with EPA and MassDEP regulations concerning NOx, vehicle manufacturers use a variety of exhaust treatment systems to control NOx emissions. Exhaust gas recirculation (EGR) systems reintroduce some exhaust gases into the engine's intake. This lowers the peak temperature of combustion, which reduces the chance of NOx forming. Some vehicles use a lean NOx trap, a system that relies on the power control module's ability to toggle the air-fuel ratio between rich and lean. The trap absorbs NOx from exhaust during lean air mixtures, and ultimately reduces it to nitrogen gas when the air-fuel ratio is switched to a rich mixture and back to lean. A diagram of a lean NOx trap (referred to as a Nitrogen Oxide Catalytic Converter) as used in the Volkswagen models at issue appears below:

[continued on next page]



**Exhaust system of a Volkswagen Golf**

Volkswagen has used two basic types of technology to reduce emissions of nitrogen oxides from diesel engines, by either trapping the pollutants or treating them with urea. The first type is shown here.

**Main computer**
Engine control module

Diesel oxidation catalytic converter

Oxygen sensor

Muffler

Diesel particulate filter

Temperature sensors

Oxygen sensor

H2S catalytic converter

Exhaust valve

**Nitrogen oxide trap**
This system traps nitrogen oxides, reducing toxic emissions. But the engine must regularly use more fuel to allow the trap to work. The car's **computer** could save fuel by allowing more pollutants to pass through the exhaust system. Saving fuel is one potential reason that Volkswagen's software could have been altered to make 11 million cars pollute more, according to researchers at The International Council on Clean Transportation.

42.     Federal and Massachusetts regulations require manufacturers to apply for certifications that their vehicles meet applicable emission standards. 40 C.F.R. § 86.1843-01. The federal application must include a list of all auxiliary emission control devices installed on the vehicle. *Id*. at § 86.1844-01(d)(11). An auxiliary emission control device is defined as "any element of design which senses . . . any . . . parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." *Id*. at § 86.1803-01. The federal application must contain a detailed justification for each auxiliary emission control device that results in a reduction in the effectiveness of the emission control system, and a rationale for why it is not a "defeat device." *Id*. at § 86.1844-01(d)(11).

43.     Defeat devices are expressly forbidden by federal regulations. *See* EPA, Advisory Circular Number 24: Prohibition on use of Emission Control Defeat Device  (Dec. 11, 1972); *see also* 40 C.F.R. §§ 86-1809-01, 86-1809-10, 86-1809-12. Stated simply, a defeat device is hardware or software that "defeats" the vehicle's emission controls during normal vehicle operation—enabling the vehicle to produce low emissions during emissions testing, but not during normal operation. The Clean Air Act makes it a violation for any person to sell, manufacture, or install any component in a motor vehicle "where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle . . . in compliance with the regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." Clean Air Act, 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1854012(a)(3)(ii). Similarly, the EPA has specifically recognized that electronic control systems that affect the emission control system's performance may be defeat devices. EPA, Advisory Circular Number 24-2: Prohibition on Emission Control Defeat Devices – Optional Objective Criteria (Dec. 6, 1978).

44.     Every vehicle sold in the U.S. must be covered by Certificate of Conformity from the EPA. 40 C.F.R. § 86.1843-01. However, vehicles are only covered by a Certificate of Conformity if they are sold as described in the manufacturer's application for certification. *Id.* at §86.1848-10(c)(6). Similarly, auto manufacturers must be certified by MassDEP in order to sell vehicles in Massachusetts.  Motor vehicles equipped with defeat devices, which reduce the effectiveness of the emission control system during normal driving conditions, cannot be certified.

45.     Both federal and Massachusetts regulations mandate that manufacturers include certain emissions-related labels on the vehicles they sell. First, the regulations require that an emissions label titled "Vehicle Emission

Control Information" be placed under the hood or in the engine compartment and contain "an unconditional statement of compliance" with federal and Massachusetts emissions regulations. 40 C.F.R. § 86.1807-01; 310 CMR 7.4, adopting Cal. Code. Regs. Tit. 13 § 1965. Auto manufacturers must affix this label to every motor vehicle that they intend to sell to the public in the United States subject to the applicable emissions standards. Below is an exemplar Emission Control label from a non-diesel Volkswagen vehicle:



46.     Beginning in the 1998 model year, the California Air Resources Board and mandated that manufacturers include a Smog Index label on all new cars sold in California. The label was intended to help consumers compare smog forming emissions from different vehicles within that model year. Massachusetts adopted this mandate in 1999. Cars manufactured after January 1, 2009, were also required to affix an Environmental Performance label. These labels provided both a Smog Score and a Global Warming Score, ranging from 1 to 10, with 10 being the cleanest and 5 being the average vehicle. An example of this label from a non-diesel vehicle is below:

[continued on next page]



**C.    Volkswagen Lied to Its Consumers and Deliberately Concealed the Excessive and Unlawful Levels of Pollution Emitted by Many of Its So-Called "Clean Diesel" Vehicles**

47.    In May 2014, West Virginia University's Center for Alternative Fuels, Engines & Emissions published the results of a study commissioned by the International Council on Clean Transportation ("ICCT") that found in-use emissions from two Volkswagen vehicles (a 2012 Jetta and a 2013 Passat) that were significantly higher than the Tier 2 Bin 5 NOx standard. The Jetta exceeded the standard by 15 to 35 times and the Passat exceeded it by 5 to 20 times.[1]

48.    Following publication of the study, the EPA and CARB began to investigate the issue. Volkswagen responded that increased emissions could be the result of unexpected technical issues or conditions. Volkswagen then issued a voluntary recall in December 2014, but testing performed by CARB and the EPA showed that there was only a limited benefit to the recall and that the vehicles still did not comply with EPA or CARB standards.

49.    Thus, for years, Volkswagen failed to disclose to the public and to consumers the presence of the defeat devices in the Affected Vehicles and the true nature of its Affected Vehicles' performance and emissions.

50.    On September 18, 2015, the EPA served Volkswagen with a Notice of Violation ("NOV") of the Clean Air Act.[2] The NOV explains that Volkswagen secretly installed a defeat device in certain of its diesel vehicles. As described

---

[1] A full copy of the study is attached as **Exhibit D**.
[2] *See* **Exhibit A**.

herein, the defeat device is a complex software algorithm which enables the vehicles to bypass emissions standards by engaging the emission control function only during official emissions testing and rendering it inoperative at all other times.

51. Most modern engines, including Volkswagen's "Clean Diesel" engines, use computerized engine control systems to monitor sensors throughout a car's engine and exhaust systems and control operation of the car's systems to ensure optimal performance and efficiency. These functions can include controlling fuel injection, valve and ignition timing, and, as in Volkswagen's "Clean Diesel" engines, operating the engine's turbocharger. The engine control computer can, for example, ensure that the air-to-fuel mixture is correct based on sensor readings such as throttle position, amount of air flowing into the engine, and engine temperature.

52. These engine control computers also receive data from sensors in the car's exhaust system that measure the amounts of chemical substances included in the car's exhaust. That data provides a measure of the engine's operation and efficiency, and is thus used by the engine control computer in operating the car's systems to ensure the desired performance and efficiency. Because modern cars include these sophisticated computers and sensors throughout the car's systems, emissions testing systems use a car's existing sensors to measure the presence of pollutants and track compliance with EPA and state emissions standards. Emissions testing stations plug a diagnostic device into the car's on-board diagnostics ("OBD II") port and use the car's exhaust sensors during the testing procedure to measure the substances emitted. Some states, instead of or in addition to an OBD II diagnostic device, use a measurement probe inserted into the car's exhaust pipe to measure the chemicals emitted.

53. Volkswagen programmed the engine control computers in the Affected Vehicles with software that detects when the cars are undergoing emissions testing, and then operates the car's engine and exhaust systems to ensure

that emissions comply with EPA pollutant standards. When the car is not being emissions tested—that is, under the vast majority of operating conditions—the engine control systems operate the vehicle in a manner that does not comply with EPA emissions requirements.

54.    The following graphic prepared by Reuters summarizes Volkswagen's defeat device software:



55.    In short, vehicles equipped with the defeat device software meet emissions standards only during testing; in normal operation they emit pollutants, including nitrogen oxides, at up to 40 times the legal limit.

56.    As noted in the EPA's official press release, NOx is dangerous to public health:

> NOx pollution contributes to nitrogen dioxide, ground-level ozone, and fine particulate matter. Exposure to these pollutants has been linked with a range of serious health effects, including increased asthma attacks and other respiratory illnesses that can be serious enough to send people to the hospital. Exposure to ozone and particulate matter have also been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory disease are particularly at risk for health effects of these pollutants.[3]

57.    Unsurprisingly, then, and as noted, defeat devices are illegal.  The Clean Air Act expressly prohibits engine parts or components which "bypass, defeat, or render inoperative" the emission control system.  CAA § 203 (a)(3)(B).  Volkswagen's software did just that and, in so doing, violated the Clean Air Act.

58.    Volkswagen also violated the Clean Air Act by falsely certifying to the EPA that the Affected Vehicles would meet applicable federal emission standards in order to obtain the EPA- issued Certificate of Conformity, which is required to sell vehicles in the United States.

59.    The California Air Resources Board made similar findings.[4]

60.    As the journal Popular Mechanics reported, non-Volkswagen diesels commonly use urea injection to "neutralize" NOx emission, but those systems add weight and complexity to the engine. "Everyone wondered how VW met emissions

---

[3] **Exhibit A.**
[4] *See* **Exhibit B.**

standards while foregoing urea injection. As it turns out, they didn't. It wasn't magical German engineering. Just plain old fraud," the journal reported.

61.    In sum, Volkswagen couldn't balance performance with the low pollution it promised. So it cheated.

## D.    Volkswagen Admitted Its Fraud

62.    Volkswagen AG's (now former) CEO Martin Winterkorn has already acknowledged the fraud and issued an apology for having "broken the trust of our customers and the public."

63.    Similarly, Volkswagen Group of America, Inc.'s CEO, Michael Horn, conceded that Volkswagen "was dishonest with the EPA, and the California Air Resources Board, and with all of you."  He went on to admit that Volkswagen "totally screwed up" and that it "must fix the cars."

64.    In a public statement released on September 22, 2015, Volkswagen admitted that there is "[a] noticeable deviation between bench test results and actual road use."[5]

## E.    Volkswagen Has Reaped Considerable Profit From Its Fraud

65.    Volkswagen charged premiums of several thousands of dollars for the Clean Diesel models of the Affected Vehicles.  These premiums are represented in the chart below and reflect the value consumers placed on the advertised features of the Clean Diesel vehicles and paid to obtain, and which Volkswagen promised to all, but delivered to no one:

| Clean Diesel Price Premium | | | |
|---|---|---|---|
| Model | Base | Mid-Level | Top-Level | Average |
| VW Jetta | $2,860.00 | $1,570.00 | $1,030.00 | $1,820.00 |
| VW SportWagen | $5,570.00 | $1,680.00 | $0.00 | $2,416.67 |
| VW Golf | $2,400.00 | $1,000.00 | $1,000.00 | $1,466.67 |
| VW Golf SportWagen | $2,950.00 | $1,000.00 | $1,000.00 | $1,650.00 |
| VW Beetle | $4,635.00 | $4,920.00 | $0.00 | $3,185.00 |
| VW Beetle Convertible | $4,080.00 | $530.00 | $700.00 | $1,770.00 |

[5] **Exhibit E.**

| VW Passat | $5,755.00 | $2,845.00 | $2,135.00 | $3,578.33 |
| Audi A3 | $2,300.00 | $2,300.00 | $2,300.00 | $2,300.00 |
| Average | $3,818.75 | $1,980.63 | $1,020.63 | $2,273.33 |

66.     Had Volkswagen revealed the truth about the Affected Vehicles, eco-conscious consumers would have taken their business to other automobile manufacturers.

**F.    Plaintiffs and Class Members Have Suffered Significant Harm as a Result of Volkswagen's Fraud**

67.     Volkswagen will not be able to adequately fix the Affected Vehicles. The EPA has ordered Volkswagen to bring the Affected Vehicles into compliance with the emissions standards of the Clean Air Act, but doing so will materially compromise the vehicles' performance and/or fuel efficiency.

68.     Even if Volkswagen is able to make the Affected Vehicles EPA-compliant through a retrofit, the vehicles will no longer perform as previously represented to the public and consumers, and Plaintiffs and Class Members will be deprived of the benefits Volkswagen promised and for which they bargained when they purchased or leased the Affected Vehicles.

69.     Volkswagen failed to disclose these material facts to the public and to consumers. Had Plaintiffs and Class Members known of the defect at the time they decided to purchase or lease the Affected Vehicles, they would have declined to purchase or lease the vehicles, or would have paid considerably less than they did.

70.     Experts in the automotive technology have said that disengaging the pollution controls on a diesel-fueled car can yield better performance, including increased torque and acceleration. "When the pollution controls are functioning on these vehicles, there's a trade-off between performance and emissions," said Drew Kodjak, executive director of the ICCT—the organization that first detected the deception.  He stated, "[t]his is cutting corners." As noted above, the ICCT, in conducting research on diesel vehicles, first noticed the discrepancy between Volkswagen's emissions in testing laboratories and on the road. It brought the

issue to the attention of the EPA, which conducted further tests on the cars, and ultimately discovered the use of the defeat device software.

71.     As a result, even if Volkswagen is able to make Class Members' affected vehicles EPA compliant, Class Members will nonetheless suffer actual harm and damages because their vehicles will no longer perform as they did when purchased and as advertised. This will necessarily result in a diminution in value of every affected vehicle and it will cause owners of affected vehicles to pay more for fuel while using their affected vehicles.

72.     Volkswagen's customers relied on its eco-promises that it now has admitted were false. Customers, understandably, have voiced their frustration online:



73.    In sum, the Affected Vehicles do not function as reasonable consumers expect, and have lost considerable value. Moreover, Plaintiffs and Class Members will incur additional expenses at the pump as a result of decreased fuel efficiency—likely the only fix to cure the NOx emissions violation.

## V.  FRAUDULENT CONCEALMENT ALLEGATIONS

74.    Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals associated with Volkswagen responsible for disseminating false and misleading marketing materials (and marketing materials with material omissions) regarding the Affected Vehicles.  Volkswagen is necessarily in possession of all of this information. Plaintiffs' claims arise out of the Volkswagen's fraudulent concealment of the Defect and the safety hazard it poses, and its representations about the safety of the Affected Vehicles. To the extent that Plaintiffs' claims arise from the Volkswagen's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically at the time they purchased their Affected Vehicles, Volkswagen knew, or as reckless in not knowing, of the Defect. Volkswagen was under a duty to disclose the Defect based upon their exclusive knowledge of the defect; Volkswagen never disclosed the Defect to the Plaintiffs or the public at any time or place or in any manner until within the last week (and then, only partially-so).

75.    Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Volkswagen:

(a)    ***Who***:  Volkswagen actively concealed the Defect from Plaintiffs and the Class while simultaneously touting the safety, fuel-efficiency,

eco-friendliness, and power of the Affected Vehicles.[6]  Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Volkswagen responsible for such decisions.

(b)    ***What***:  Volkswagen knew, or was reckless or negligent in not knowing, that the Affected Vehicles contain the Defect.  Volkswagen concealed the Defect and made express representations about the safety, fuel-efficiency, eco-friendliness, and power of the Affected Vehicles.[7]

(c)    ***When***:  Volkswagen concealed material information regarding the Defect at all times and made representations about the Affected Vehicles, starting no later than 2009, or at the subsequent introduction of each Affected Vehicle model, continuing through the time of sale, and on an ongoing basis. Volkswagen has, universally, not yet disclosed the full truth about the Defect in the Affected Vehicles to anyone.

(d)    ***Where***:  Volkswagen concealed material information regarding the true nature of the Defect in every communication they had with Plaintiffs and the Class and made representations about the safety, fuel-efficiency, eco-friendliness, and power of the Affected Vehicles.  Despite counsel's review and analysis of marketing materials, sales brochures, and auto manuals for each of the Affected Vehicles, Plaintiffs are aware of no document, communication, or other place or thing, in which Volkswagen disclosed the truth about the Defect in the Affected Vehicles to anyone outside of Volkswagen.  Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on Volkswagen's websites.

(e)    ***How***:  Volkswagen concealed the Defect from Plaintiffs and Class Members and made representations about the safety of the Affected

---

[6] *See supra* re: advertisements within this Complaint and attached Exhibits of Plaintiffs' specific vehicle sales brochures.
[7] *Id.*

Vehicles.[8] Volkswagen actively concealed the truth about the existence and nature of the Defect from Plaintiffs and Class Members at all times, even though they knew about the Defect and knew that information about the Defect would be important to a reasonable consumer. Volkswagen promised in their marketing materials that Affected Vehicles have qualities that they do not have, such as the combination of safety, fuel-efficiency, eco-friendliness, and power.

(f)     *Why*:  Volkswagen actively concealed material information about the Defect in the Affected Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase the Affected Vehicles rather than purchasing competitors' vehicles, and made representations about the safety, fuel-efficiency, eco-friendliness, and power of the Affected Vehicles.[9]  Had Volkswagen disclosed the truth, Plaintiffs and Class Members (and reasonable consumers) would not have bought the Affected Vehicles or would have paid less for them.

## VI.  TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

76.    The tolling doctrine was made for cases of concealment like this one. For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

77.    Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered that Volkswagen was concealing and misrepresenting the true emissions levels of its vehicles, including but not limited to its use of defeat devices.

78.    As reported in the *New York Times* on September 19, 2015, the International Council on Clean Transportation, a research group, first noticed the difference between Volkswagen's emissions in testing laboratories and in normal

---

[8] *Id.*
[9] *Id.*

use on the road. The International Council on Clean Transportation brought the defeat device issue to the attention of the EPA. The EPA, in turn, conducted further tests on the vehicles, and ultimately uncovered the unlawful use of the defeat device software. Thus, Volkswagen's deception with respect to its Clean Diesel engines, engine control systems, and "defeat devices" was painstakingly concealed from consumers and regulators alike.

79.    Plaintiffs and the other Class members could not reasonably discover, and did not know of facts that would have caused a reasonable person to suspect, that Volkswagen intentionally failed to report information within its knowledge to federal and state authorities, its dealerships, or consumers.

80.    Likewise, a reasonable and diligent investigation could not have disclosed that Volkswagen had information in its sole possession about the existence of its sophisticated emissions deception and that it concealed that information, which was discovered by Plaintiffs immediately before this action was filed. Plaintiffs and other Class members could not have previously learned that Volkswagen valued profits over compliance with applicable federal and state emissions and consumer law.

## B.    Tolling Due To Fraudulent Concealment

81.    Throughout the relevant time period, all applicable statutes of limitation have been tolled by Volkswagen's knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

82.    Instead of disclosing its emissions deception, or that the emissions from the Affected Vehicles were far worse than represented, Volkswagen falsely represented that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

## C.    Estoppel

83.    Volkswagen was under a continuous duty to disclose to Plaintiff and the other Class members the facts that it knew about the emissions from Affected Vehicles, and of those vehicles' failure to comply with federal and state laws.

84.    Although it had the duty throughout the relevant period to disclose to Plaintiff and Class members that it had engaged in the deception described in this Complaint, Volkswagen chose to evade federal and state emissions and clean air standards with respect to the Affected Vehicles, and it intentionally misrepresented its blatant and deceptive lack of compliance with state law regulating vehicle emissions and clean air.

85.    Thus, Volkswagen is estopped from relying on any statutes of limitations in defense of this action.

## VII.  CLASS ACTION ALLEGATIONS

86.    Plaintiff bring this action on behalf of herself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class and subclasses (collectively, the "Classes"):

### The Nationwide Class

All persons or entities in the United States who are current or former owners and/or lessees of an "Affected Vehicle."

### The Massachusetts Subclass

All persons or entities in the state of Massachusetts who are current or former owners and/or lessees of an "Affected Vehicle."

87.    Excluded from the Class are individuals who have personal injury claims resulting from the "defeat device" in the Clean Diesel system. Also excluded from the Class are Volkswagen and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental

entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

88.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

89.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

**1.     Numerosity: Federal Rule of Civil Procedure 23(a)(1).**

90.     The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are not less than hundreds of thousands of members of the Classes, the precise number of Class members is unknown to Plaintiffs, but may be ascertained from Volkswagen's records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

**2.     Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**

91.     This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

(a)     Whether Volkswagen engaged in the conduct alleged herein;

(b)     whether Volkswagen designed, advertised, marketed, distributed, leased, sold, or otherwise placed Affected Vehicles into the stream of commerce in the United States;

(c)     whether the Clean Diesel engine system in the Affected Vehicles contains a defect in that it does not comply with EPA requirements;

(d)     whether the Clean Diesel engine systems in Affected Vehicles can be made to comply with EPA standards without substantially degrading the performance and/or efficiency of the Affected Vehicles;

(e)     whether Volkswagen knew about the "defeat device" and, if so, how long Volkswagen has known;

(f)     whether Volkswagen designed, manufactured, marketed, and distributed Affected Vehicles with a "defeat device";

(g)     whether the Affected Vehicles suffer from the Defect;

(h)     whether Volkswagen knew or should have known about the Defect, and, if yes, how long Volkswagen has known of the Defect;

(i)     whether the defective nature of the Affected Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase an Affected Vehicle;

(j)     whether Volkswagen's conduct violates consumer protection statutes and other laws as asserted herein;

(k)     whether Plaintiffs and the other Class members overpaid for their Affected Vehicles;

(l)     whether Volkswagen omitted and failed to disclose material facts about the Affected Vehicles;

(m)     whether Volkswagen's concealment of the true defective nature of the Affected Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing Affected Vehicles;

(n)     representing that Affected Vehicles are of a particular standard and quality when they are not, advertising Affected Vehicles with the intent not to sell them as advertised, and otherwise engaging in conduct likely to deceive;

(o)    whether Volkswagen failed to disclose and/or actively concealed the Defect in the Affected Vehicles under the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A by failing to adequately investigate, disclose, and remedy, and their misrepresentations and omissions regarding the safety, reliability, and functionality of their Affected Vehicles;

(p)    whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

(q)    whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

### 3.    Typicality: Federal Rule of Civil Procedure 23(a)(3).

92.    Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Volkswagen's wrongful conduct as described above.

### 4.    Adequacy: Federal Rule of Civil Procedure 23(a)(4).

93.    Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

### 5.    Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).

94.    Volkswagen has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

### 6.   Superiority: Federal Rule of Civil Procedure 23(b)(3).

95.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Volkswagen, so it would be impracticable for members of the Classes to individually seek redress for Volkswagen's wrongful conduct.

96.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CAUSES OF ACTION

### A.    Claims Asserted on Behalf of the Nationwide Class

## COUNT  I
### Unjust Enrichment

97.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

98.    Plaintiff brings this Count on behalf of the Nationwide Class.

99.    Volkswagen has been unjustly enriched by the purchases of the Affected Vehicles by Plaintiffs and the Class Members.

100.   On behalf of all Class Members, Plaintiffs seek to recover Volkswagen's unjust enrichment.

101.   Plaintiff and the Class Members unknowingly conferred a benefit on Volkswagen of which it had knowledge since it was aware of the defective nature

of the Affected Vehicles and the defeat device, but failed to disclose this knowledge and misled Plaintiffs and the Class members regarding the nature and quality of the Affected Vehicles while profiting from this omission and deception.

102.    The circumstances are such that it would be inequitable, unconscionable and unjust to permit Volkswagen to retain the benefit of these profits that it unfairly has obtained from Plaintiff and the Class members.

103.    Plaintiff and the Class members, having been damaged by Volkswagen's conduct, are entitled to recover or recoup damages as a result of the unjust enrichment of Volkswagen to their detriment.

104.    Alternatively, Plaintiff and the Class members seek to recover for Volkswagen's unjust enrichment under the substantially similar laws of the states of purchase.

**B.    Claims Brought on Behalf of the Massachusetts Subclass**

**COUNT  II**
**Fraudulent Concealment**
**(Common Law)**

105.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

106.    Plaintiff Hilary Sargent brings this Count on behalf of the Massachusetts Subclass.

107.    Volkswagen intentionally concealed that the Clean Diesel engine systems were not EPA-compliant and used a "defeat device," or acted with reckless disregard for the truth, and denied Plaintiff and the other Massachusetts Subclass members' information that is highly relevant to their purchasing decision.

108.    Volkswagen further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Affected Vehicles it was selling were

new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

109.   Volkswagen knew these representations were false when made.

110.   The Affected Vehicles purchased or leased by Plaintiff Hilary Sargent and the other Massachusetts Subclass members were, in fact, defective, non-EPA compliant, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Clean Diesel engine system, as alleged herein.

111.   Volkswagen had a duty to disclose that these Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective Clean Diesel engine system, because Plaintiff Hilary Sargent and the other Massachusetts Subclass members relied on Volkswagen's material representations that the Affected Vehicles they were purchasing were safe, environmentally clean, efficient and free from defects.

112.   The aforementioned concealment was material because, if it had been disclosed, Plaintiff Hilary Sargent and the other Massachusetts Subclass members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

113.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for Affected Vehicles to pass EPA emissions requirements.  Volkswagen intentionally made the false statements in order to sell Affected Vehicles.

114.   Plaintiff Hilary Sargent and the other Massachusetts Subclass members relied on Volkswagen's reputation – along with Volkswagen's failure to disclose the faulty and defective nature of the Clean Diesel engine system and Volkswagen's affirmative assurance that its Affected Vehicles were safe and

reliable, and other similar false statements – in purchasing or leasing Affected Vehicles.

115.   As a result of their reliance, Plaintiff Hilary Sargent and the other Massachusetts Subclass members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Affected Vehicles.

116.   Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff Hilary Sargent and the other Massachusetts Subclass members. Plaintiff Hilary Sargent and the other Massachusetts Subclass members are therefore entitled to an award of punitive damages to the extent permitted under applicable law.

**COUNT  III**
**Violations of the Massachusetts Consumer Protection Act**
**(Mass. Gen. Laws Ch. 93A)**

117.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

118.   Plaintiff Hilary Sargent brings this Count on behalf of the Massachusetts Subclass.

119.   Plaintiff intends to assert a claim under the Massachusetts Consumer Protection Act ("MCPA"), which makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS CH.93A, § 2(1).  Plaintiff Hilary Sargent will make a demand in satisfaction of MASS. GEN. LAWS CH.93A, § 9(3), and may amend this Complaint to assert claims under the MCPA once the required 30 days have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the MCPA.

## IX.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Classes respectfully request that the Court enter judgment in their favor and against Volkswagen, as follows:

A.      Certification of the proposed Classes, including appointment of Plaintiffs' counsel as Class Counsel;

B.      An order temporarily and permanently enjoining Volkswagen from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      Injunctive relief in the form of a recall or free replacement program;

D.      Costs, restitution, damages, and disgorgement in an amount to be determined at trial;

E.      Revocation of acceptance;

F.      For treble and/or punitive damages as permitted by applicable laws;

G.      An order requiring Volkswagen to pay both pre- and post-judgment interest on any amounts awarded;

H.      An award of costs and attorneys' fees; and

I.      Such other or further relief as may be appropriate.

## X.  DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED this 28th day of September 2015.

Respectfully submitted,

THORNTON LAW FIRM LLP

By  */s/ Michael Thornton*
Michael Thornton,  BBO# 497390
THORNTON LAW FIRM LLP
100 Summer Street, 30th Floor
Boston, MA 02110

Michael P. Thornton, BBO# 497390
David J. McMorris, BBO#  338970
Leah M. Carlsen, BBO# 681437
THORNTON LAW FIRM LLP
100 Summer Street, 30th Floor
Boston, MA 02110
Telephone: (617) 720-1333
Facsimile:  (617) 720-2445
mthornton@tenlaw.com
dmcmorris@tenlaw.com
lcarlsen@tenlaw.com